UNITED STATES BANKRUPTCY COURT      **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                         :         Chapter 15
                               :
OVERSIGHT AND CONTROL       :
COMMISSION OF AVÁNZIT, S.A.,    :        Case No. 07-13765 (SMB)
                               :
                    Debtor.     :
-------------------------------------------------------X

### MEMORANDUM DECISION DENYING MOTION
### TO DISMISS AND GRANTING RECOGNITION

**A P P E A R A N C E S :**

FULBRIGHT & JAWORSKI LLP
Attorneys for Foreign Representative
666 Fifth Avenue
New York, NY 10103

      Zack A. Clement, Esq.
      David A. Rosenzweig, Esq.
      C. Mark Baker, Esq.
      Anibal Sabater, Esq.
      Johnathan C. Bolton, Esq.
          Of Counsel

JAY L. WESTBROOK, ESQ.
Attorney for Foreign Representative
University of Texas at Austin School of Law
727 East Dean Keeton Street
Austin, Texas 78705

DAVIS POLK & WARDWELL
Attorneys for BNP Paribas Andes, S.A.
450 Lexington Avenue
New York, New York 10017

      Karen E. Wagner, Esq.
      James L. Kerr, Esq.
      John D. Couriel, Esq.
      Alicia Llosa, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

The Oversight and Control Commission of Avánzit, S.A. (the "Oversight Commission") filed a petition for recognition under chapter 15 of the United States Bankruptcy Code.  (Verified Petition under Chapter 15 for Recognition of a Foreign Main Proceeding and Application for Provisional Injunctive Relief, dated Nov. 29, 2007) ("Petition")(ECF Doc. # 2.)  Banque Nationale de Paris Paribas Andes, S.A. ("BNPP Andes" or the "Bank"), a Peruvian bank, opposed the petition, and filed a motion for summary judgment to dismiss it.  The Bank contends that once Avánzit approved its repayment plan in its Spanish bankruptcy, the latter was no longer a "foreign proceeding" capable of recognition.  For the reasons that follow, the Court denies the motion to dismiss and grants recognition.

## BACKGROUND

The material facts are not in dispute although the application of the Bankruptcy Code to those facts is.  At all relevant times, Avánzit has been engaged in the telecommunications business.  It and its subsidiaries provide infrastructure and engineering services, technology solutions and services, audiovisual facilities services, and content and location-based services in 25 counties around the world.  ([Oversight Commission's] Statement of Material Facts on Recognition as to Which There is No Genuine Issue to be Tried, dated Jan. 23, 2008 ("Rule 7056-1(b) Statement"), at ¶ 3)(ECF Doc. # 35.)[1]

---

[1]     BNPP Andes filed its own statement of material facts pursuant to Rule 7056-1(b), Statement of Material Facts as to Which There is No Genuine Issue to be Tried, dated Jan. 16, 2008 (ECF Doc. # 25).

On May 31, 2002, Avánzit filed a petition seeking a suspensión de pagos, or suspension of payments (the "Suspension Proceeding"), before the Madrid Court of First Instance No. 26 (the "Spanish Insolvency Court") under Spain's 1922 Suspension of Payments Act (the "SOPA").[2]  (Id. at ¶ 8.)  In general, a suspensión de pagos is commenced when the debtor files a petition with a Spanish insolvency court, and the court issues a commencement order.  (Expert Report at ¶ 6.)  Among other things, the commencement order triggers an automatic stay against litigation and collection, and appoints trustees, or interventores, who control the debtor's activities jointly with the debtor's management.  (See id. at ¶ 6.)  In addition, notice of commencement of the proceeding is publicized through appropriate entries made in the Commercial, Real Estate and Civil Registries.  (Id. at ¶ 10.)

The main purpose of a suspensión de pagos is to allow the debtor to reach a convenio, or repayment plan, with its creditors.  (Id. at ¶ 5.)  The convenio must be approved by a majority of creditors and ratified by the court.  (Id. at ¶ 7.)  The approval is also publicized, inter alia, through appropriate entries made in the Commercial, Real Estate and Civil Registries.  (Id.)  Once the convenio is approved by the court, the limitations imposed by the commencement order are lifted, and replaced by the limitations provided in the convenio.  (Id.)  The creditors whose claims are dealt with under the convenio are barred from pursuing their claims except in accordance with the

---

Unless otherwise indicated, this opinion refers only to the undisputed paragraphs in the Oversight Commission's statement.

[2]     The Insolvency Act of 2003 repealed the SOPA, but Avánzit's case is still governed by the former law.  (Amended Expert Report of Jose M. Delgado, Prof. Juana Pulgar and Prof. Calvo-Caravaca, dated Jan. 23, 2008 ("Expert Report"), at ¶ 4)(ECF Doc. # 48.)

convenio.  (Transcript of hearing held Jan. 29, 2008 ("1/29 Tr.") at 48-49)(ECF Doc. #
54.)

The proceeding does not terminate until the payment plan is fully consummated.
Until then, the Public Prosecutor remains a party to the case.  (Expert Report at ¶ 19(3).)
When the convenio has been fully consummated, the insolvency court issues a closing
order.  (See Expert Report at ¶ 8; 1/29 Tr. at 18.)  Upon issuance of the closing order, the
entries made in the Registries are cancelled.  (Expert Report at ¶ 8; see ¶ 19(4).)  In the
case of a breach or failure to fulfill a convenio, the convenio may be converted into a
liquidation agreement or proceeding -- a quiebra consecutive.  (Id. at ¶ 5.)

A.      **Avánzit's Suspension Proceeding**

As stated, Avánzit filed its suspensión de pagos petition on May 31, 2002.  On
June 4, 2002, the Spanish Insolvency Court acknowledged Avánzit's suspensión de pagos
petition, and ordered the commencement of the proceeding.  (Rule 7056-1(b) Statement,
at ¶ 14; Expert Report at ¶ 9.)  Three judicial intervenors, Rafael Figueroa, Jose Antonio
Tortosa, and Banco Santander Central Hispano, were nominated to oversee Avánzit's
assets and affairs.  (Rule 7056-1(b) Statement at ¶ 14.)  The judicial intervenors rendered
a report of Avánzit's assets and liabilities that included a $25 million deposit,[3] discussed
below, as one of the assets.  (Id., at ¶ 16.)

---

[3]      "$" refers to United States dollars.

On January 7, 2004, the Spanish Insolvency Court approved Avánzit's <u>convenio</u> (the "Convenio").[4]  (<u>Id.</u> at ¶ 24.)  The Convenio provided for payments to creditors over six years, or until February 19, 2010.  (<u>Id.</u> at ¶ 39; <u>see</u> <u>Convenio</u> at Art. 3, § 1(c).)  The judicial intervenors were discharged when the Convenio was approved, (<u>Rule 7056-1(b) Statement</u> at ¶ 29), but the Convenio established the Oversight Commission, which consisted of five members, including a non-voting member representing Avánzit.[5]  (<u>Convenio</u> at Art. 5.)  The Oversight Commission was authorized to act as representatives of the creditors.  (<u>Convenio</u> at Art. 5.)  It was charged with the task of supervising and controlling strict compliance with the Convenio, (<u>id.</u> at Art. 6), and its existence terminated "as soon as [the Convenio] has been fulfilled in its entirety."  (<u>Id.</u> at Art. 7, § 8; <u>accord</u> <u>Rule 7056-1(b) Statement</u> at ¶¶ 27-29.)  The Oversight Commission was not, however, authorized to interfere in Avánzit's operations, which were returned to the company.  (<u>Convenio</u> at Art. 5.)

Finally, article 12 set forth the scope of the Spanish Insolvency Court's post-Convenio jurisdiction.  It provided:

> To settle any disagreement or dispute that may derive from the interpretation, enforcement and/or performance of this Agreement between Avánzit . . . and its creditors, they all submit to the jurisdiction and competence of [the Spanish Insolvency Court], as ordered by current Bankruptcy Reorganization Law.

---

[4]    An English translation of the Convenio is annexed as Exhibit C(2) to the <u>Declaration of Juan Miguel Goenechea</u>, dated Jan. 11, 2008 ("<u>Goenechea Declaration</u>")(ECF Doc. # 27).

[5]    The Chairman of the Oversight Commission is Rafael Figueroa, one of the former judicial intervenors.  (<u>Rule 7056-1(b) Statement</u> at ¶ 28.)

**B.**    **The Dispute with BNPP Andes**

The current litigation is driven by a dispute between Avánzit and BNPP Andes that goes back several years.[6]  On December 28, 2001, BNPP Andes and Avánzit entered into a Credit Transfer Agreement (the "CCC") under which BNPP Andes acquired contractual credits from Avánzit for a purchase price of $25 million.  (Petition at ¶¶ 23-24.)  The credits arose under three agreements between Avánzit and Teleconsorcio, two of which were the subject of pending arbitrations.  (See id. at ¶¶ 20-22.)  BNPP Andes could terminate the CCC upon the insolvency of Avánzit in Spain.  (Id. at ¶ 24.)

On the same day, the Bank and Avánzit entered into a Time Deposit Account Opening Agreement (the "TDA"), which was governed by New York law.  (Id. at ¶ 25.)  Avánzit deposited the $25 million paid under the CCC into the TDA.  (Id.)  Avánzit intended to use the TDA to fund lending and investment activities in the United States.  (Id.)

Avánzit filed the Suspension Proceeding five months later.  In August 2002, the tribunal in one of the arbitrations entered a $14 million award against Avánzit.[7]  (Id. at ¶ 27.)  On September 30, 2002, the Bank terminated the CCC, and set off the $25 million in the TDA against the amounts allegedly owed under the CCC (the "Setoff").   (See id. at ¶ 28.)  While Avánzit did not (and the Oversight Commission does not) contest the Bank's right to terminate the CCC, they contend that the Setoff violated Spanish insolvency law.

---

[6]      The Court makes no findings of fact or conclusions of law regarding the issues between the parties, and includes this part of the discussion for informational purposes only.

[7]      In July 2003, the other arbitration resulted in an award of $6 million against Avánzit.   (Petition at ¶ 27.)

The Setoff triggered litigation in multiple venues.  In March 2003, Avánzit sued

BNPP Andes in a civil court in Madrid seeking a declaration that the Setoff was invalid

under Spanish law.   (Id. at ¶ 34.)  On March 30, 2004, the Madrid court issued a

judgment granting the Bank's motion to dismiss for lack of jurisdiction, and indicated

that the courts of Peru were the appropriate forum (the "Madrid Judgment").  (See

Goenechea Declaration at Ex. D(2).)  The Bank had already commenced an action in

Peru four days earlier seeking a declaration that the Setoff was valid.  (Petition at ¶ 37.)

Avánzit asserted a counterclaim, seeking a declaration that the Setoff was invalid and

unenforceable, (Declaration of Julio Cesar Perez Vargas, dated Jan. 14, 2008, at ¶ 3)(ECF

Doc. # 29), and BNPP Andes filed its reply.  (Id. at ¶ 4.)  The Peruvian civil court closed

the record as to further evidence, and the matter is still pending.  (See id. at ¶ 9.)

**C.      The September 27, 2007 Order**

While Avánzit and the Bank were engaged in litigation in Peru, the Oversight

Commission opened a third front.  On or about June 11, 2007, it filed a motion in the

Spanish Insolvency Court.  (Goenechea Declaration at Ex. H(2).)  The motion recounted

some of the history of the dispute between the parties, and emphasized that the $25

million at issue had been considered an asset of the Avánzit estate.  Moreover, without

the $25 million, Avánzit was insolvent, and the Oversight Commission implied that the

consummation of the Convenio was in jeopardy.  Among other things, the Oversight

Commission sought authority to file a chapter 15 to investigate the facts relevant to the

$25 million, and recover it for distribution according to Spanish law.  To facilitate these

actions, the Oversight Commission asked the Spanish Insolvency Court to declare that

Avánzit remained in a state of legal suspension of payments and provisional insolvency,

7

and that the Oversight Commission represented the creditors and was the foreign representative authorized to commence the chapter 15 case in New York.

The Spanish Insolvency Court granted the motion by order dated September 27, 2007 (the "September Order").  (Petition at Ex. A.)  It declared that Avánzit remained in a legal state of suspension of payments, stated that the Oversight Commission was the foreign representative, and authorized the Oversight Commission to file a chapter 15 in this Court for the ultimate purpose of recovering the $25 million so that the Spanish Insolvency Court could decide the correct distribution in conformity with Spanish law.  It appears that the September Order was issued without prior notice to BNPP Andes.

**D.     The Chapter 15 Proceedings**

On November 29, 2007, the Oversight Commission filed the Petition, seeking recognition of the Suspension Proceeding as a foreign main proceeding pursuant to sections 1504 and 1515 of the Bankruptcy Code.  The Oversight Commission simultaneously sought ex parte injunctive relief (1) suspending the right to transfer, encumber or otherwise dispose of any assets of Avánzit; (2) staying execution against Avánzit's assets; (3) entrusting the administration or realization of all of Avánzit's assets located in the United States to the Oversight Commission; and (4) providing for the examination of witnesses, the taking of evidence and the delivery of information concerning Avánzit's assets, affairs, rights and obligations.  (Memorandum of Law in Support of (1) Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and (2) Application for Order to Show Cause with Temporary Restraining Order and Preliminary Injunction, dated Nov. 29, 2007, at 2)(ECF Doc. # 6.)  The Court denied the motion for ex parte injunctive relief.  After the Bank appeared, the parties

entered into a consensual injunction that essentially stayed any further collection

activities by the Bank pending the resolution of the Petition, but excepted the Peru

litigation from its scope.  (Stipulation and Order Adjourning Hearing on Motion for

Preliminary Injunction and Setting Hearing on Verified Petition, dated Dec. 6,

2007)(ECF Doc. # 18.)

The Bank opposed recognition and moved to dismiss the Petition.  The Bank

essentially contends that once the Convenio was approved, the Spanish Insolvency Court

no longer exercised control and supervision of Avánzit's assets and affairs for the

purpose of reorganization.  For the same reason, the Bank asserts that the Suspension

Proceeding was no longer a "pending" foreign proceeding.  For support, the Bank quoted

the Oversight Commission's own expert, who summarized the effect of the Convenio on

Avánzit's operations:

> The fact that a Convenio is approved and the interventores cease in
> their office upon confirmation of a Convenio does not mean that the
> proceeding is ended or that the debtor does not remain subject (although
> generally to a different kind of) limitations which depending on the
> Convenio may be more or less strict or broad.  Nor has the effect of the
> bankruptcy court remaining having ultimate jurisdiction to control the
> fulfilment of the Convenio and, ultimately, declaring its fulfilment and the
> closing of the proceeding.  Therefore, while it is true that in practice it is
> common to refer to such moment as a moment in which the suspension of
> payment is lifted, this must be properly understood as referring to the
> lifting of the "status" and limitations initially imposed on the debtor by the
> Commencement Order and the Order that declared it in suspension of
> payments upon commencement.  But this does not mean that the debtor,
> while recovering substantial control over day to day affairs in the normal
> course of business does not remain subject to (generally less stringent)
> limitations or that the proceeding becomes closed, since, as above
> mentioned, the closing can only be made upon fulfilment of the Convenio
> and the issuance of a specific order by the court to such effect.

(Expert Report at ¶ 17.)

While both sides have supplied expert affidavits that opine on whether the Spanish Insolvency Court still maintains supervision and control over Avánzit for the purpose of reorganization, the issue separating the parties ultimately involves the interpretation of the Bankruptcy Code to which I turn.

## DISCUSSION

### A.    Introduction

Congress adopted chapter 15 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  Chapter 15 incorporates the Model Law on Cross-Border Insolvency (the "Model Law") promulgated by the United Nations Commission on International Trade Law ("UNCITRAL").  11 U.S.C. § 1501(a).  It is intended to promote "cooperation between United States courts, trustees, examiners, debtors and debtors in possession and the courts and other competent authorities of foreign countries; greater legal certainty for trade and investment; fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested entities, including the debtor; the protection and maximization of the debtor's assets; and the facilitation of the rescue of financially troubled businesses."  In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007); accord 11 U.S.C. § 1501(a).

A chapter 15 case is commenced when a foreign representative files a petition for recognition of a foreign proceeding under 11 U.S.C. § 1515.  Bear Stearns, 374 B.R. at 127.  The petition must be accompanied by certain documentary evidence, 11 U.S.C. § 1515(b), which the court is entitled to presume is authentic.  11 U.S.C. § 1516(b).

Subject to section 1506 (regarding public policy exceptions), the court must grant

recognition, if it finds, after notice and a hearing, that

> (1)      such foreign proceeding for which recognition is sought is a
> foreign main proceeding or foreign nonmain proceeding within the
> meaning of section 1502;
>
> (2)      the foreign representative applying for recognition is a person or
> body; and
>
> (3)      the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a).

The burden of establishing recognition rests on the foreign representative.  In re

Basis Yield Alpha Fund (Master), 381 B.R. 37, 52 (Bankr. S.D.N.Y. 2008).  A decision

or certificate of a foreign court indicating that the foreign proceeding is a "foreign

proceeding" and that the petitioner is a "foreign representative" is presumptively correct.

See 11 U.S.C. § 1516(a).  The presumption does not, however, prevent the Court from

examining into the facts.  Basis Yield Alpha Fund, 381 B.R. at 52 ("[T]he court always

has the power to make its own determination on qualification under section 1517,

notwithstanding the presence of section 1516 and the absence of an actual objection.").

## B.      Is the Suspension Proceeding a "Foreign Proceeding"?

A chapter 15 case is ancillary to a "foreign proceeding."  Section 101(23) now

defines a "foreign proceeding" as

> a collective judicial or administrative proceeding in a foreign country,
> including an interim proceeding, under a law relating to insolvency or
> adjustment of debt in which proceeding the assets and affairs of the debtor
> are subject to control or supervision by a foreign court, for the purpose of
> reorganization or liquidation.

Although the definition, which is taken from the Model Law, incorporates several requirements, including "control and supervision" and "for the purpose of reorganization or liquidation," the Bankruptcy Code does not explain what they mean. In resolving these ambiguities "the court shall consider [chapter 15's] international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. In addition, the Court may look to the Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency (the "Guide"), U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997), promulgated in connection with the approval of the Model Law. RSM Richter Inc. v. Aguilar (In re Ephedra Prods. Liab. Litig.), 349 B.R. 333, 336 (S.D.N.Y. 2006); Bear Stearns, 374 B.R. at 129; H.R. Rep. No. 109-31(I) at 106 n.101, reprinted in 2005 U.S.C.C.A.N. 169 n.101.

As a general matter, a suspensión de pagos fits squarely within the definition of a "foreign proceeding."[8] The SOPA concerns insolvency and the adjustment of debt. The proceeding is a collective judicial proceeding in which the debtor reaches a payment agreement with its creditors subject to the approval of the insolvency court. Trustees are appointed, and the assets and affairs of the debtor are subject to control or supervision by the Spanish court for the purpose of reorganization or liquidation.

BNPP Andes appears to concede that the Suspension Proceeding qualified as a "foreign proceeding" up to the point that the Convenio received final approval. (Corrected Memorandum of Law in Opposition to Application for Recognition and in

---

[8]   The Guide refers to a suspension of payments an example of the type of proceeding eligible for recognition. (Guide at ¶ 24.)

<u>Support of Motion to Dismiss Chapter 15 Petition or for Summary Judgment Dismissing</u>
<u>the Petition</u>, dated Jan. 16, 2008 ("<u>Bank's Memo</u>"), at 20)(ECF Doc. # 33.)  It contends,
however, that it lost its status as a "foreign proceeding" at that point because the
restrictions imposed on Avánzit were lifted, the trustees were discharged, and Avánzit
was free to manage its own business.

Chapter 15 recognizes that the status of the foreign proceeding can change, and
the change can affect the right to recognition before or after it is granted.  Section
1517(d) allows the court to modify or terminate recognition if the grounds for granting it
"have ceased to exist."  In addition, section 1518(1) requires the foreign representative to
file a notice of any substantial change of status of the foreign proceeding or the foreign
representative's appointment.  Thus, whether embedded in the definition of "foreign
proceeding" or contained elsewhere, a "foreign proceeding" can lose its status.

It does not follow, however, that the approval of the Convenio, and the return of
management and daily control to Avánzit, produced the change in status that the Bank
assumes.  The Model Law does not define "reorganization," but under United States law,
a bankruptcy reorganization commonly means a financial restructuring "esp[ecially] in
the repayment of debts, under a plan created by a trustee and approved by a court."
BLACK'S LAW DICTIONARY 1324 (8th ed. 2004).  The Bank's argument focuses on the
approval of the plan and the discharge of the trustees, but ignores the repayment of debts,
a critical component of any reorganization.

Avánzit will continue to make payments to its creditors under the Convenio
during the next two years; if it fails, it faces liquidation in the Spanish Insolvency Court.

Although the Spanish Insolvency Court's control and supervision was reduced once the Convenio was approved, it did not surrender all supervision and control. The Spanish Insolvency Court continues to oversee the payment of claims, and more generally, to settle any disagreement concerning the "interpretation, enforcement and/or performance of [the Convenio] between Avánzit . . . and its creditors." (Convenio at Art. 12.) The closing order will not be issued until the payments are completed.

The Oversight Commission's motion and the September Order plainly demonstrate that the Spanish Insolvency Court maintains control of Avánzit's assets and affairs to the extent they concern the payments to creditors under the Convenio. The motion alleged that without the $25 million, which the trustees had reported as an asset of the estate, Avánzit would be insolvent. In addition, it implied that the consummation of the Convenio would be in jeopardy. The Oversight Commission sought authority from the Spanish Insolvency Court to recover the Setoff for distribution to creditors in accordance with Spanish law, and the court granted the motion.

The Bank argues that it did not receive notice of that application, and is not bound by the findings and conclusions of the Spanish Insolvency Court. The Bank also contends that the September Order is inconsistent with the Madrid Judgment, which ruled that the Spanish courts lacked jurisdiction over the dispute between Avánzit and the Bank.[9] (See Bank's Memo, at 32-33; Reply Declaration of Luis Diez-Picazo y Ponce de Leon, dated Jan. 25, 2008, at ¶ 11 (ECF Doc. # 42); Declaration of Luis Diez-Picazo y

---

[9]     Although it is unnecessary to decide the issue today, the "inconsistency" argument is a perplexing one. The Spanish court did not rule that the United States Bankruptcy Court lacked jurisdiction over Avánzit's dispute with the Bank, nor could it. The authorization to file a chapter 15 in the United States is not, therefore, inconsistent with the Madrid Judgment. In fact, if the Spanish courts lack jurisdiction, it seems perfectly appropriate for the Spanish Insolvency Court to authorize a foreign representative to litigate the dispute in a court that may have it.

Ponce de Leon, dated Jan. 14, 2008, at ¶¶ 22-27 (ECF Doc. # 28).)  The Bank does not

contend and has not shown, however, that the Spanish Insolvency Court lacked

jurisdiction under the Convenio to appoint a foreign representative for the purpose of

commencing this chapter 15 case.  Indeed, the power to do so flowed directly from the

Convenio; the recovery of the Setoff is closely connected to the Convenio payments and

Avánzit's ability to consummate its plan.

Furthermore, the bright line the Bank wants to draw runs counter to the goals of

chapter 15.  The purpose of chapter 15 is to encourage cooperation between domestic and

foreign courts, increase legal certainty, promote fairness and efficiency, protect and

maximize value and facilitate the rescue of financially troubled businesses.  11 U.S.C. §

1501(a).  Substantial litigation and other liquidation activities may take place under the

supervision and control of the bankruptcy court after the plan, or its equivalent, has been

confirmed or approved.  The exercise of jurisdiction is the sine qua non of supervision

and control to the extent that a matter falls within the bankruptcy court's jurisdiction.

These goals would be frustrated if "foreign proceeding" was interpreted in a manner that

cut off assistance at a time when cooperation, certainty, fairness, asset values and

financial relief were most needed, simply because the debtor successfully prosecuted its

reorganization case.  Cf. In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd., 238 B.R. 25, 50

(Bankr. S.D.N.Y. 1999)(if sanctioning a scheme cut off eligibility for assistance under

former section 304, "we would grant ancillary petitions in advance of the sanctioning of

schemes of arrangement, but refuse such relief once the schemes had received court

approval. This result would stand the notion of comity on its head by our refusal to grant

assistance for the very reason that the foreign court had acted.").

Our own experience with chapter 11 provides a stark example of how a bankruptcy court continues to exercise control and supervision over a confirmed case. Both sides agree, in this regard, that Avánzit's status is similar to the a chapter 11 debtor after confirmation.  Under the Bankruptcy Code, and unless the confirmation order or the plan states otherwise, confirmation revests the property of the estate in the debtor, free and clear of all claims and interests, 11 U.S.C. § 1141(b), (c), and discharges the debtor. 11 U.S.C. § 1141(d).  The reorganized debtor goes about its business, free of the constraints placed on trustees under the Bankruptcy Code.  When the case has been fully administered, a final decree is entered closing the case.  FED. R. BANKR. P. 3022; see 11 U.S.C. § 350(a).[10]

Between confirmation and the final decree, the bankruptcy court continues to exercise jurisdiction over the case, albeit in a more limited fashion.  Thus, although the jurisdiction "shrinks," Penthouse Media Group v. Guccione (In re Gen. Media, Inc.), 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005), it does not end.  The bankruptcy court retains jurisdiction under 11 U.S.C. § 1142(b) to direct the debtor or any necessary party to execute an act necessary for the consummation of the plan and it has "continuing responsibilities to satisfy itself that the [p]lan is being properly implemented."  Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.), 982 F.2d 721, 750 (2d Cir. 1992).

---

[10]        "Factors that the court should consider in determining whether the estate has been fully administered include (1) whether the order confirming the plan has become final, (2) whether deposits required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4) whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced, and (6) whether all motions, contested matters, and adversary proceedings have been finally resolved."

FED. R. BANKR. P. 3022 advisory committee's note.

In fact, the court may be called upon to resolve more issues and disputes post-confirmation than pre-confirmation.  Chapter 11 plans, particularly liquidation plans, often create liquidation trusts to pursue causes of action for the benefit of the unsecured creditors.  E.g., In re Teligent, Inc., 306 B.R. 752, 755-56 (Bankr. S.D.N.Y. 2004), aff'd, 326 B.R. 219 (S.D.N.Y. 2005).  Post-confirmation, a liquidation trust may initiate hundreds of litigations in the bankruptcy court.  E.g., Global Crossing Estate Representative v. Alta Partners Holdings LDC (In re Global Crossing, Ltd.), A.P. No. 04-01731, 2008 WL 934012, *3 (Bankr. S.D.N.Y. Apr. 8, 2008)(stating that the estate representative had filed over 1,000 avoidance actions post-confirmation, seeking an aggregate of approximately $340 million); In re Teligent, Inc., No. 01-12974, 2005 WL 267956, at *1 (Bankr. S.D.N.Y. Feb. 3, 2005)(noting that the estate representative had commenced over 1,000 adversary proceedings and filed 1,000 claims objections in the bankruptcy court after the case was confirmed).  In addition, debtors (or trustees) may continue to liquidate assets post-confirmation, through sales or otherwise, for the benefit of the creditors.  E.g., Woods v. Kenan (In re Woods), 173 F.3d 770 (10th Cir. 1999), cert. denied, 528 U.S. 878 (1999).

Bankruptcy courts exercise post-confirmation jurisdiction over these matters.[11] Under the Bank's formulation, a foreign court applying the same Model Law would be forced to deny assistance to any debtor or post-confirmation trustee seeking to recover property in the foreign state simply because the debtor had confirmed a plan.  Moreover,

---

[11]    Enron Corp., a chapter 11 debtor reorganized in this Court, offers another glaring example of how bankruptcy courts continue to exercise jurisdiction over confirmed debtors and their cases.   Enron confirmed its plan by order dated July 15, 2004.  (Order Confirming Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, and Related Relief, dated July 15, 2004, Case No. 01-16034)(ECF Doc. # 19,759.)  Since the confirmation date, approximately 12,000 additional entries have appeared on the Enron case docket.  This does not include docket entries in adversary proceedings.

a chapter 7 trustee seeking similar assistance would not be barred from seeking help

under the Model Law because plans are not confirmed under chapter 7.  The Model Law

establishes a "golden rule," and the extension of the Bank's argument would be inimical

to the interests of our own bankruptcy stakeholders and to the goals that chapter 15

advances.  In the absence of a clearer indication that chapter 15 requires this result, I

conclude that it does not.

Accordingly, the Suspension Proceeding is still a "foreign proceeding."  It

continues to be a collective proceeding under Spanish insolvency law, and remains in a

state of reorganization while Avánzit attempts to consummate the Convenio.  Finally, as

evidenced by the September Order, the Spanish Insolvency Court still exercises control

and supervision over Avánzit's assets and affairs to the extent necessary to ensure

compliance with and consummation of the Convenio.

### C.       Is the Suspension Proceeding "Pending"?

The Bank makes a variation of the same argument when it contends that the

Suspension Proceeding is not "pending."  The Court must recognize the foreign

proceeding as either "main" or "nonmain."  11 U.S.C. § 1517(b).  A "'foreign main

proceeding' means a foreign proceeding <u>pending</u> in the country where the debtor has the

center of its main interests."  11 U.S.C. § 1502(4)(emphasis added).  A "nonmain"

proceeding is one (other than a main proceeding) that is <u>pending</u> in a country where the

debtor maintains an establishment.  11 U.S.C. § 1502(5).  The Bank argues that the

Suspension Proceeding was no longer "pending" after the Convenio was approved.

I disagree.  First, "pending," as used in 11 U.S.C. § 1502(4) and 1502(5), refers to the location of the foreign case, not the stage of the proceeding.  Article 2(b) of the Model Law, the counterpart of section 1502(4), states that "'foreign main proceeding' means a foreign proceeding <u>taking place</u> in the State where the debtor has the centre of its main interests."  (Emphasis added).  Chapter 15 uses "pending" rather than "taking place," but the same meaning is presumably intended.  In either case, the definition focuses on the relationship between the venue of the proceeding and the location of the debtor's center of main interests.  If they match, the proceeding is a foreign main proceeding.  If they don't match, but the debtor maintains an establishment in the country where the foreign proceeding is venued, it is a nonmain proceeding.  In short, the phrase "pending" refers to situs, not status.

Second, a bankruptcy case in general, and a chapter 11 case in particular, is "pending" until it is closed.  <u>In re Emerson Radio Corp.</u>, 52 F.3d 50 (3d Cir. 1995) addressed an identical question construing Federal Bankruptcy Rule 1014, and its reasoning is instructive.  There, Emerson Radio Corp. ("Emerson") filed a chapter 11 case in the New Jersey bankruptcy court.  Under an agreement in principle, an affiliate (FIL) would provide debtor in possession and exit financing, and in exchange, receive 90% of the new common stock issued under the plan and a $45 million note.  <u>Id.</u> at 51.

FIL provided the debtor in possession financing, but reneged on the exit financing.  As a result, Emerson's chief executive officer (Jurick), who was also an indirect owner of FIL, arranged for the exit financing.  Emerson confirmed its plan, and issued the new common stock to Jurick, his affiliates, and other entities that apparently provided the exit financing.  <u>Id.</u> at 51-52.  FIL did not receive any stock under the plan.

FIL was subsequently placed in insolvency proceedings in the Bahamas, and the

Bahamian court appointed a provisional liquidator (Aranha).  The Bahamian liquidator

filed an ancillary case under former section 304 in the Southern District of New York for

the purpose of administering the new Emerson shares and enjoining Jurick and the other

recipients from disposing of the shares.  Id. at 52.  On motion made to the New Jersey

bankruptcy court, Jurick moved to transfer the New York ancillary case to New Jersey

under Rule 1014(b).  Rule 1014(b) provided, in relevant part, that if two or more petitions

were filed in different districts against a debtor and an affiliate,

> on motion filed in the district in which the petition filed first is <u>pending</u> . .
> . the court may determine . . . the district or districts in which the case or
> cases should proceed."

FED. R. BANKR. P. 1014(b)(emphasis added).  The New Jersey district court withdrew the

reference, ordered the ancillary case transferred, and dismissed the ancillary case.

Emerson Radio, 52 F.3d at 52.

On appeal, the Bahamian liquidator argued, as BNPP Andes does here, that "a

bankruptcy proceeding ends upon confirmation of the reorganization plan or when the

plan is consummated."  Id. at 54.  The ancillary case was instituted after Emerson

confirmed its plan, and most of the plan had already been consummated.  Aranha argued

that as a result, Emerson was no longer a "debtor" when the New Jersey court ordered the

transfer.  Id.

Affirming the transfer order, the Third Circuit Court of Appeals rejected the

contention, and ruled that the case was still open and "pending" despite plan

confirmation:

> Aranha also cites various bankruptcy court cases for the
> proposition that substantial consummation of the reorganization plan
> effectively closes the debtor's estate and creates a new entity. None of the
> cases is persuasive as none addressed the issue before us. Instead, we
> follow the plain language of 11 U.S.C. § 350, which provides that "[a]fter
> an estate is fully administered and the court has discharged the trustee, the
> court shall close the case." Thus, as the case is still open, Emerson is a
> debtor within Rule 1014(b) and the case is still "pending" within the rule.

Id. at 54 (footnote omitted); accord In re Malden Mills Indus., Inc., 361 B.R. 1, 9

(Bankr. D. Mass. 2007). This conclusion is consistent with the substantial body of case

law arising in various contexts that a bankruptcy case remains open or "pending" until the

court enters an order dismissing or closing it. See e.g., In re Tannen Towers Acquisition

Corp., 235 B.R. 748, 754 (D. N.J. 1999)("It is uncontested that Tannen's bankruptcy plan

has been confirmed but remains open pending a final decree."); Krystal Cadillac-

Oldsmobile-GMC Truck, Inc. v. Gen. Motors Corp., 232 B.R. 622, 626 (E.D. Pa.

1999)("[A] bankruptcy case is considered to still be pending until such time as the estate

has been fully administered, the court has discharged the trustee and closed the case."); In

re Lundquist, 371 B.R. 183, 186 (Bankr. N.D. Tex. 2007)("[C]ourts have construed the

meaning of the term 'pending' for the purposes of section 362(c) when deciding whether

a case is pending until closing or until dismissal."); In re Williams, 363 B.R. 786, 788

(Bankr. E.D. Va. 2006)("Courts have routinely equated 'pending' with 'not

dismissed.'"); In re Moore, 337 B.R. 79, 81 (Bankr. E.D.N.C. 2005)(same); In re Island

Helicopters, 211 B.R. 453, 457 (Bankr. E.D.N.Y. 1997)(debtor's prior case remains open

where "[a] previously confirmed plan of reorganization has not been consummated and

no final decree has been entered"); In re Wilson, 154 B.R. 769, 771 n.3 (Bankr. M.D.

Ala. 1993)("A case under chapter 11 is 'pending' from its inception until the final decree

enters and the case is closed.")

In reaching its conclusion, the <u>Emerson</u> court also rejected Aranha's contention, the same one that the Bank essentially directs at the Suspension Proceeding, that the Court should ignore the ministerial nature of the final decree in favor of the reality of chapter 11:

> We do not ignore Aranha's argument that an order closing the bankruptcy case is ministerial and that "the scheme of Chapter 11 is premised upon the corporate and economic realities of reorganization, not upon the mechanics of the clerk's office." Appellant br. at 14-15. Whatever the abstract merit of this argument, it would not be a basis for departing from the plain language of section 350 and Rule 1014(b). Courts and parties in a bankruptcy proceeding should know with a fair degree of certainty the court which can entertain an application. Applying Rule 1014(b) and section 350 as written supplies that certainty. Thus, we reiterate that a bankruptcy case is pending under Rule 1014(b) unless it has been closed under 11 U.S.C. § 350.

<u>Id.</u> at 54-55 (footnotes omitted).

Although the instant dispute concerns the Suspension Proceeding, not a chapter 11, the same rationale applies. A chapter 11 case remains "pending" after confirmation but before it is closed by the entry of a final decree. This conclusion reflects "the practical reality that in most cases the bankruptcy court still has jurisdiction over the case and oversees implementation of the plan." <u>Emerson Radio</u>, 52 F.3d at 55 n.7. Similarly, the Spanish Insolvency Court exercises jurisdiction after the Convenio is approved for the same purpose, and the Suspension Proceeding remains open until an order is entered that formally closes the case and directs the cancellation of the entries in the Registries.

## D.    Avánzit's Public Disclosures

The Bank also argues that Avánzit has acknowledged in its own public disclosures that its insolvency proceeding ended in 2004 when the Convenio was approved. For example, Avánzit's legal counsel wrote to the Spanish National Securities

and Exchange Commission on January 29, 2004, reporting the "lifting of the bankruptcy reorganization that affected the company," and the discharge of the trustees. (Goenechea Declaration at Ex. F(2).)  In the same vein, Avánzit reported in a July 2007 prospectus that Avánzit and its subsidiaries obtained the "final court decisions lifting the bankruptcy reorganizations" in 2004.  (Id. at Ex. E(2).)

Statements like these prove nothing,[12] and do not stifle this Court's inquiry.  In the United States, a company that confirms a plan is apt to declare that it has "emerged" from bankruptcy despite the fact that it continues to consummate the plan and appear in matters before the bankruptcy court.[13]  Regardless of how it represents its status, it remains a debtor in a pending case.  Once again, Emerson illustrates the point.  The Bahamian liquidator argued that Emerson was not a "debtor" because Emerson's reorganization plan referred to the new Emerson as something other than "debtor."  Rejecting the argument, the Court pointed to the "obvious" fact that "the choice of terms settled upon by the drafters of the reorganization plan cannot be dispositive of the statutory issue before us."  Emerson Radio, 52 F.3d at 55 n.6.

Moreover, even Avánzit's Spanish accountants see the reorganization as an ongoing work in progress.  According to Deloitte's audit report for the year ending December 31, 2005, "during the 2005 fiscal year, the [Avánzit] Group continues with the

---

[12]    The Bank has not demonstrated the elements of estoppel.

[13]    For example, Delta Air Lines, a debtor in this Court, confirmed its Plan by order dated April 25, 2007.  (Order Confirming Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated Apr. 25, 2007, Case No. 05-17923)(ECF Doc. # 5998.)  Since then, it has consistently reported in SEC filings and quarterly post-confirmation status reports that it has "emerged" from bankruptcy.  Yet Delta continues to object to claims and reject leases in the bankruptcy court, and since confirmation, over 1,000 new entries have appeared on the ECF docket.  According to the Bank's counsel, the Delta Air Lines case is no longer "pending."  (1/29 Tr. at 8.)  The Delta bankruptcy court and the litigants might disagree.

23

planned reorganization," and "have created provisions to cover the estimated costs of the planned reorganization processes." (Goenechea Declaration, Ex. G(2) at ¶ 5.)  The audit report also referred to "the lifting of the [Avánzit] Group companies' bankruptcy reorganizations and the success of the reorganization measures in progress."  (Id. at ¶ 7.) In short, the Avánzit reorganization is still open and "pending."

**E.      Recognition**

Based on the foregoing, the Court concludes that the Suspension Proceeding is a "foreign proceeding" within the meaning of the Bankruptcy Code.  In addition, the Suspension Proceeding is a "foreign main proceeding."  See 11 U.S.C. §§ 1502(4), 1517(a)(1), 1517(b)(1).  Avánzit is a sociedad anónima organized under the laws of Spain.  (Rule 7056-1(b) Statement at ¶ 1.)  Its registered address is Alcalá, 518 28027 Madrid, (id. at ¶ 2), which is presumed to be the center of Avánzit's main interests.  See 11 U.S.C. § 1516(c).  In addition, it leases a large office building in downtown Madrid for its management offices.  (Rule 7056-1(b) Statement at ¶ 5.)  Accordingly, the Oversight Commission has satisfied its burden of proof under 11 U.S.C. § 1517 (a)(1) and (b)(1).

I also conclude that the Oversight Commission is a "foreign representative" and a "person or body" within the meaning of 11 U.S.C. § 1517(a)(2).  Section 101(24) defines a "foreign representative" to mean:

> a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).  The Bankruptcy Code says, in relevant part, that "[t]he term

'person' includes individual, partnership and corporation."  11 U.S.C. § 101(41).  The use

of "includes" is not limiting, 11 U.S.C. § 102(3), and encompasses "persons" that do not

fit squarely within the examples.  Neither the Bankruptcy Code nor the Model Law

defines "body," but the context suggests that it includes "[a]n artificial person created by

a legal authority."  See BLACK'S LAW DICTIONARY 185.

The Oversight Commission meets the definition of a "foreign representative," and

hence, of a "person or body."  It was created under the Convenio approved by the

Spanish Insolvency Court for the stated purpose of protecting the interests of the creditors

and assuring Avánzit's compliance with its payment obligations.  Furthermore, the

Spanish Insolvency Court expressly authorized the Oversight Commission to pursue and

recover the $25 million for the benefit of Avánzit's creditors and distribution under

Spanish law.

Lastly, the Petition meets the requirements of 11 U.S.C. § 1515.[14]  See 11 U.S.C.

§ 1517(a)(3).  The Petition annexed, as Exhibit A, a certified copy (in English and

---

[14]    Section 1515 states:

(a)    A foreign representative applies to the court for recognition of a foreign
proceeding in which the foreign representative has been appointed by filing a petition for
recognition.

(b)    A petition for recognition shall be accompanied by -

(1)    a certified copy of the decision commencing such foreign proceeding
and appointing the foreign representative;

(2)    a certificate from the foreign court affirming the existence of such
foreign proceeding and of the appointment of the foreign representative; or

(3)    in the absence of evidence referred to in paragraphs (1) and (2), any
other evidence acceptable to the court of the existence of such foreign proceeding and of
the appointment of the foreign representative.

Spanish) of the September Order.  The September Order declared, in substance, that the

Suspension Proceeding is a pending foreign proceeding and that the Oversight

Commission is the foreign representative with the specific authority to recover the Setoff.

Although the Bank argues that it is not bound by these declarations, they are presumed to

be correct.  11 U.S.C. § 1516(a).  In any event, for the reasons stated, I independently

reach the same conclusions under the United States Bankruptcy Code.

**F.    Postscript**

Although the Oversight Commission has overcome the hurdle of recognition, its

quest to recover the Setoff still faces obstacles.  Avánzit is currently litigating its

entitlement to the Setoff in Peru, and the Oversight Commission apparently intends to

pursue the same claim through this chapter 15.  The Bank contends that the Madrid

Judgment collaterally estops the Oversight Commission from pursuing its claim here, and

the Bank has raised the question of the Oversight Commission's standing to recover the

Setoff in light of Avánzit's counterclaim in Peru.  The recognition order does not resolve

these issues or the merits of the Setoff dispute.

In conclusion, the application for recognition as a foreign main proceeding is

granted, and the motion for summary judgment dismissing the Petition is denied.  The

---

(c)      A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d)      The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English.  The court may require a translation into English of additional documents.

foregoing constitutes the Court's findings of fact and conclusions of law.  The Court has

considered the other arguments made by the parties and concludes that they lack merit.

Settle order on notice.

Dated: New York, New York
       April 18, 2008

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Judge